STATE of North Dakota, Plaintiff and Appellee,

v.

Patrick T. McMORROW, Jr., Defendant and Appellant.

Cr. No. 775.

Supreme Court of North Dakota.

Jan. 13, 1982.

Bruce D. Quick, Asst. State's Atty., Fargo, for plaintiff and appellee.

Edward J. Murphy, Fargo, for defendant and appellant.

ERICKSTAD, Chief Justice.

Patrick T. McMorrow, Jr., is appealing from a judgment of conviction entered by the District Court of Cass County, in which he was convicted of the offense of arson. McMorrow was sentenced to four years at the State Penitentiary.

The issue on appeal is whether or not the district court erred in allowing testimony regarding a conversation between McMorrow and his wife in the presence of a third party. The testimony was permitted over McMorrow's claim of a husband-wife privilege pursuant to Rule 504 of the North Dakota Rules of Evidence. We conclude that the presence of a third party overcomes the presumption that communications between spouses are confidential. We therefore affirm.

The charge of arson against McMorrow stems from a fire in the early morning hours of July 7, 1980. An investigation after the fire revealed that the cause of the fire was arson. This conclusion was based in part on the smell and presence of fuel oil at the scene of the fire and the presence of burned matches and a five-gallon container with a small amount of fuel oil in the basement. A small number of "fireruns" and "trailers" were found in the carpet in the north end of the basement that were consistent with the use of an accelerant. The fire officials could find no natural cause for the fire.

The house which burned was a two-story house, divided into three apartments. McMorrow had rented the back apartment for approximately two years, until July 1, 1980. Although he was no longer renting the apartment, McMorrow continued to store some of his property in the basement apartment of the house after the first of July. On July 3, 1980, McMorrow obtained an insurance policy with American Family Insurance Company on personal property. That policy contained "off-premises" coverage that included property stored in the basement apartment.

The fire occurred on July 7, 1980. Following the fire, McMorrow contacted the insurance company and reported a loss due to fire damage.

The testimony at issue in this case concerns a conversation that occurred between McMorrow and his wife on August 24, 1980, in the parking lot at Hardee's, a restaurant in Fargo. At that time, Roger Hagen, a friend of McMorrow's, was seated in the driver's seat of Hagen's car. Mrs. McMorrow was seated in the passenger seat. Patrick McMorrow was standing outside the car near Mrs. McMorrow. McMorrow and his wife had just finished a counseling session with a local priest. The testimony indicates that an argument ensued in which Mrs. McMorrow asked McMorrow why he started the fire. He replied that he did it for the insurance money because of his wife's constant complaints about lack of money.

At the trial, the court received, over counsel's objection, the wife's testimony concerning the conversation at the Hardee's parking lot. It ruled that, because of the presence of Roger Hagen, the conversation between McMorrow and his wife was not privileged. The ruling follows:

"THE COURT: The Court as the trier of fact will find that the previous testimony by the witness Roger Hagen did not in any way indicate that the communication was made in any low voice or anything and quite to the contrary. Therefore, the Court will make as a finding of fact that the statements made during that evening were not made as a privileged communication and were made in a voice that could easily be heard by a third party and a third party was present to the knowledge of all parties that were a party to that conversation that night. Therefore, the Court will find that this is an exception under Rule 504 of the Rules of Evidence inasmuch as it was not in the nature of a privileged communication because of the presence of Roger Hagen. Objection is overruled. : . . ."

We agree that the conversation between McMorrow and his wife was not confidential and thus was not privileged.

Rule 504 of the North Dakota Rules of Evidence relates to the husband-wife privilege. It reads:

"An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any *confidential* communication between the accused and the spouse." [Emphasis added.] Rule 504(b), N.D.R.Ev.

A confidential communication is defined in Section (a) of Rule 504:

"A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person." Rule 504(a), N.D.R.Ev.

McMorrow argues that he intended his conversation with his wife to be confidential and that Hagen was an eavesdropper to the conversation. He contends that the following language in the explanatory note to Rule 504 supports his argument:

"The intent with which a communication is made may determine whether it is confidential. If a communication is made privately, with the intent that it not be disclosed, it is confidential for the purposes of this rule even though it is overheard by an eavesdropper to the conversation. But cf. § 82, McCormick on Evidence (2d ed. 1972)." Explanatory Note, Rule 504, N.D.R.Ev.

■ Marital communications are presumed to be confidential. That presumption, however, may be overcome by proof of facts showing that they were not intended to be private. *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *Blau v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951); *Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *State v. Smith*, 384 A.2d 687 (Me.1978).

■ The State urges this court to employ an objective test in determining whether or not a spouse intended the communication to be confidential. Alternatively, it urges that even if we adopt a subjective test that the communication at issue was not subjectively intended to be confidential. We believe that the spouse who seeks to assert the claim of privilege must have acted in reliance upon an expectancy of confidentiality that is reasonable under all the circumstances. We therefore adopt the objective test.

In the analogous Fourth Amendment context the United States Supreme Court in *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), said:

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." [Citations omitted.]

The Supreme Court of Maine found that the presence of the parties' children in the camper where the conversation in question

occurred, even though asleep, destroyed the defendant's reasonable expectation of confidentiality. *State v. Benner*, 284 A.2d 91 (Me.1971). The court said:

> "Hence, if confidentiality confined to husband and wife has not been purposefully and expressly sought or invoked, it must appear, as a minimally necessary condition, that the spouse whose conduct is sought to be protected by claim of privilege must have acted in *reliance* upon an *expectancy, reasonable* under all the circumstances, that the conduct itself, or other consequences which it might convey, will be transmitted *only* to the spouse and *to no other person* (such that a *confidentiality confined to husband and wife* can be a reasonable possibility under the circumstances).
>
> \* \* \* \* \* \*
>
> "[W]e are satisfied that the surrounding circumstances adequately reveal that defendant acted *without reliance* upon any *reasonable expectancy* that his wife *would* be the only person to become aware of his conduct and that it reasonably would, or reasonably could, be a matter *confined* between his wife and himself, to be shared by them alone as confidential." 284 A.2d at 109–10.

The court reasoned that under the facts of that case the defendant was or should have been aware that his older child might have awakened and, hence, in communicating to his wife, the defendant acted without a reasonable expectation that only his wife would learn of his conduct. *Id.* at 110.

In *State v. Smith*, 384 A.2d 687, 692 (Me. 1978), the Supreme Court of Maine held that the presumption of confidentiality could be rebutted by the *constructive* presence of a third party when the husband and wife are communicating. In that case, the defendant showed two stolen objects, a gun and a camera, to his wife while the two were alone in their car. They were parked in a dump site and not within the hearing or eyesight of anyone. The defendant had stolen the gun and camera from a private dwelling. Robert Gilley was present at the breaking and entry and was convicted and testified against the defendant. Gilley testified that he had observed the defendant leave the house with the gun and camera. The court concluded that because Gilley had already seen what would later be communicated to the defendant's spouse, his constructive presence rebutted the presumption of confidentiality. *Id.* at 693.

■ In the instant case, the trial court ruled that McMorrow's conversation with his wife was not confidential and therefore no husband-wife privilege existed. The trial court as a trier of fact found that the communication between McMorrow and his wife was not made in a low voice but to the contrary was made in a voice that could easily be heard by a third party and that a third party was present to the knowledge of all parties. We are reluctant to reverse the findings of the trial court. As we said in *State v. Olmstead*, 246 N.W.2d 888, 890 (N.D.1976):

> "On the question of credibility of witnesses, reading a cold transcript is no substitute for hearing and observing witnesses as they testify. Tones of voice, hesitations, confusion, surprise, and other telltale indications of mental state convey to trial judges and jurors much that is lost to appellate judges. If we were to judge from the cold print, we might decide many cases differently than trial judges do, and this case might be one of them. But, if we decided differently, we would have no assurance that ours was the better decision. We are reluctant to reverse factual findings of juries or trial judges. Appellate courts have stated in many ways, in both civil and criminal cases, their determination to give respect to the findings of trial judges and juries. Sometimes they say they will not reverse if there is substantial evidence to support the verdict [*Kresel v. Giese*, 231 N.W.2d 780, 791 (N.D.1975) ]; sometimes they say they will not substitute their judgment for that of the trial court or jury [*State v. Champagne*, 198 N.W.2d 218, 226 (N.D. 1972) ]; sometimes they speak of viewing the evidence in the light most favorable to the judgment [*State v. Neset*, 216

N.W.2d 285, 290 (N.D.1974) ]; and sometimes they speak of their great reliance on the findings of the lower court [*In re Estate of Elmer*, 210 N.W.2d 815, 819 (N.D.1973) ].

"In criminal cases we have repeatedly held that 'at the appellate level we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction.' *State v. Kaloustian*, 212 N.W.2d 843, 845 (N.D. 1973), and cases cited therein; *State v. Neset*, 216 N.W.2d 285, 287 (N.D.1974).

"However stated, these rules indicate a recognition that the truth can better be determined in the confrontation of the testimony of witnesses appearing in person than from a transcript of the testimony of those witnesses."  246 N.W.2d at 890.

When questioned by the State, Roger Hagen described the circumstances under which the conversation occurred, as follows:

"Q  Who was there at that time?

"A  It was Liz, me and Pat.

"Q  Who is Liz?

"A  Liz McMorrow, his wife.

"Q  Where were these people situated or located?

"A  At the time, they had to go see this priest.

"Q  Who is 'they?'

"A  Pat and Liz.

"Q  For what reason?

"A  To straighten out their marriage problems and have some counseling.

"Q  So this Hardee's was near the church?

"A  Right across the street from the church.

"Q  What were you doing there?

"A  I was waiting to take Liz to my place.

"Q  Was she staying with you at that time?

"A  Yes.  So was Pat McMorrow.

"Q  What exactly did you hear Pat say?

"A  At that time, they were across the street and all of a sudden Pat, well, Liz and Pat, they came to the car.  Liz got into the car.

"Q  Where did she sit?

"A  She was sitting by the passenger's window.

"Q  In the front seat?

"A  Yes.  ·

"Q  Where were you sitting?

"A  I was sitting by the driver's seat.

"Q  You were sitting behind the steering wheel?

"A  Yes.

"Q  Where was Pat?

"A  Pat was right by the window standing by her.

"Q  By his wife?

"A  Yes.

"Q  What did Pat say at that time?

"A  Pat, they were discussing the problems of their marriage.  That Liz sat there.  She asked Pat, 'Why did you light the fire?  Why did you burn the house?'

"Q  What did Pat say?

"A  Pat didn't say nothing at this time.

"Q  What happened?

"A  Liz replied, 'Why did you light the house on fire?'  And then Pat says, 'Would you come outside so we can talk about it?'  And Liz did not move out of the car.  She stayed right there.  And Pat says, 'I did it for the money.'

"Q  Say anything else?

"A  Because on account of the money problems situation that they had.  Everything else.  He says, 'You have always been bickering at me haven't got no money.  We have got no money.'  Like this.  That's why he says, 'That's why I did it.'  So then we talked for a while.  Then we left."

Elizabeth McMorrow made the following statements on examination by the State:

"Q  It's your testimony here today that at Hardee's parking lot with you being present, Mr. Hagen being present, and your husband being present, it is a whispered conversation?

"A   Yes, he was right beside my head.

"Q   You are saying nobody could have heard the conversation?

"A   I don't think anybody could have.

"Q   Do you recall giving a statement to the Police Department back on September 17, 1980, regarding this statement—regarding this conversation?

"A   Yes.  I don't remember what I said.

"Q   Do you care to read Page 3 and see if that refreshes your memory?  Get a chance to read the statement?  Want more time?

"A   I just am getting mixed up.

"Q   Do you want to take more time to read the whole statement?

"Yes, please.

*      *      *      *      *      *

"Q   Just take your time.  Have you had a chance to read it?

"A   Yes.

"Q   Does it refresh your memory?

"A   Yes.

"Q   Roger Hagen overhear those statements?

"A   I don't think so.

"Q   Pardon?

"A   As far as I can tell.

"Q   He did?

"A   I think so as far as I can tell.  I am not a doctor.  I don't know for sure.

"Q   If he was in a position where he could have overheard those statements?

"A   Yes, he was in a position he could have.

"Q   They weren't whispered?

"A   It was a low voice.  I don't know if it would be classified as a whisper."

Under the circumstances of this case, we conclude that the trial court did not err in ruling that the communication between Patrick McMorrow and his wife, Elizabeth McMorrow, was not privileged because of the presence of Roger Hagen.  It appears that the trial court properly concluded that McMorrow could not have reasonably believed that the conversation between his wife and himself would not be overheard by Hagen.

McMorrow next contends that Hagen was an eavesdropper and therefore the communication should be considered confidential. The explanatory note to Rule 504 explains:

"If a communication is made privately, with the intent that it not be disclosed, it is confidential for the purposes of this rule even though it is overheard by an eavesdropper to the conversation.  But cf. § 82, McCormick on Evidence (2d ed. 1972)."  Explanatory Note, Rule 504, N.D.R.Ev.

We do not believe that Roger Hagen can be considered an eavesdropper under Rule 504.  Black's Law Dictionary, Fifth Edition, defines "eavesdropping" as follows:

"Eavesdropping is knowingly and without lawful authority: (a) Entering into a private place with intent to listen surreptitiously to private conversations or to observe the personal conduct of any other person or persons therein;  or (b) Installing or using outside a private place any device for hearing, recording, amplifying, or broadcasting sounds originating in such place, which sounds would not ordinarily be audible or comprehensible outside, without the consent of the person or persons entitled to privacy therein;  or (c) Installing or using any device or equipment for the interception of any telephone, telegraph or other wire communication without the consent of the person in possession or control of the facilities for such wire communication.  Such activities are regulated by state and federal statutes, and commonly require a court order.

"At common law, the offense of listening under walls or windows, or the eaves of a house, and thereupon to frame slanderous and mischievous tales.  4 Bl. Comm. 168.  It was a misdemeanor at common law."

That definition requires an intent to listen surreptitiously.  Roger Hagen, in the instant case, did not surreptitiously listen in, or "eavesdrop", on the conversation between Pat McMorrow and Elizabeth McMorrow.  He simply happened to be

seated next to Mrs. McMorrow and was apparently going to drive the vehicle in which she was seated.

For the reasons stated in this opinion, we conclude that the communication between McMorrow and his wife was not privileged under Rule 504 of the North Dakota Rules of Evidence. We therefore affirm the trial court's judgment of conviction.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.