## STATE OF CONNECTICUT *v.* BRUCE R. CHRISTIAN, JR.
### (SC 17010)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued December 5, 2003—officially released March 9, 2004

*Oliver B. Dickins*, with whom, on the brief, was *Edward M. Henfey*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *John H. Malone*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Bruce R. Christian, Jr., appeals[1] from the judgment of conviction, rendered after a jury trial, of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a),[2] operation of a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes (Rev. to 1999) § 14-227a (a) (2) (A), as

---

[1] The defendant appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-56b (a) provides: "A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug."

amended by No. 99-255, § 1, of the 1999 Public Acts,[3] and reckless driving in violation of General Statutes § 14-222 (a).[4] The defendant claims that the trial court improperly: (1) permitted the defendant's wife, Joan Christian, to testify, over the defendant's objection, regarding his confidential marital communications to her; (2) refused to admit the testimony of a certain witness to show that the defendant's wife had a motive for falsely testifying against the defendant; and (3) refused to admit emergency medical "run sheets," as either prior inconsistent statements, or under the business record exception to the hearsay rule, to impeach emergency personnel who testified for the state.

[3] General Statutes (Rev. to 1999) § 14-227a (a), as amended by No. 99-255, § 1, of the 1999 Public Acts, provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor . . . . A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor . . . if such person operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property . . . (2) while such person has an elevated blood alcohol content. For the purposes of this section, 'elevated blood alcohol content' means (A) a ratio of alcohol in the blood of such person that is ten-hundredths of one per cent or more of alcohol, by weight . . . ."

References herein to § 14-227a (a) are to the 1999 revision, as amended by Public Act 99-255, § 1.

[4] General Statutes § 14-222 (a) provides in relevant part: "No person shall operate any motor vehicle upon any public highway of the state, or any road of any specially chartered municipal association or of any district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or in any parking area for ten cars or more or upon any private road on which a speed limit has been established in accordance with the provisions of section 14-218a or upon any school property recklessly, having regard to the width, traffic and use of such highway, road, school property or parking area, the intersection of streets and the weather conditions. The operation of a motor vehicle upon any such highway, road or parking area for ten cars or more at such a rate of speed as to endanger the life of any person other than the operator of such motor vehicle . . . shall constitute a violation of the provisions of this section."

Although we agree with the defendant's first two claims, we nevertheless conclude that the trial court's improprieties were harmless. We disagree with the defendant's third claim. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of March 17, 2000, the defendant went to a bar in Southwick, Massachusetts with the victim, Victoria Ryan, and the victim's roommate, Alexander Imperatrice. They arrived at the bar sometime between 9 and 9:30 p.m., whereupon the defendant, the victim and Imperatrice all consumed alcohol. At around 11 p.m., they left the bar and, with Imperatrice driving, proceeded to the victim's residence in Enfield, arriving there at approximately 11:30 p.m. Thereafter, the defendant and the victim told Imperatrice that they were "going back out," and at around 11:45 p.m., the two entered the victim's car, a 1996 Oldsmobile Cutlass Supreme, and drove off, with the victim driving.

Sometime after midnight, Debra Wilson was traveling on Suffield Street in Windsor Locks when she noticed that the car in front of her did not have its headlights illuminated. The headlights remained unlit for approximately one mile before becoming illuminated somewhere near the border between the towns of Windsor Locks and Suffield. As Wilson continued on Suffield Street into the town of Suffield, she noticed that the car in front of her had increased its speed and was "pulling away" from her, although she herself was traveling at a rate of ten or fifteen miles above the posted speed limit. Soon thereafter, Wilson lost sight of the other car's taillights.

As Wilson continued on Suffield Street in a northerly direction, the road curved sharply to the right and passed under a railroad overpass. As Wilson approached the overpass, she observed that the guard

posts along the left side of the road had been knocked down. She stopped her vehicle, whereupon she observed the victim's car resting under the railroad overpass, in a creek at the bottom of a six and one-half foot embankment off the side of the road, with steam rising from the front of the car. Wilson drove to her house, which was close to the scene of the accident, and called 911. She then returned to the accident scene and, standing at the edge of the embankment, pointed a flashlight at the victim's car. She yelled out that she had just called 911, and a male voice responded, "Thank you." According to Wilson, the voice sounded like it came from the male individual she observed sitting in the driver's seat, behind the steering wheel. Wilson asked the man if he was alright, and he responded, "We're okay." Wilson then asked how many people were in the car, and the man told her that there were two. Finally, Wilson asked him if they both were alright, and the man responded, "Yes, we're both okay." The police arrived at the scene shortly thereafter.

Officer Shawn Nelson of the Suffield police department arrived at the scene at approximately 12:50 a.m. on March 18, 2000. He identified himself as a police officer and, upon receiving no response from the occupants of the victim's car, made his way down the embankment to the vehicle. Sergeant David Bourque of the Suffield police department arrived shortly thereafter and joined Nelson at the bottom of the embankment. Nelson and Bourque both observed that the car's driver's side door was open, and that the defendant was sitting in the creek, unconscious, with his back against the open driver's side door and his body slumped forward into the driver's seat area. Through the window of the closed passenger's side door, Bourque observed that the victim "was in the passenger seat with her buttocks fully in the seat." Nelson forced open the passenger's side door, which was jammed shut, and he and

Bourque observed that the victim was seated in the passenger seat with her body slumped forward toward the vehicle's center console, which was completely destroyed. She was not wearing a seat belt. The victim did not make any movement, nor did she respond to Nelson's questions asking if she was alright.

Nelson and Bourque soon were joined by other emergency personnel, including several firefighters and Deidre Vorih, an emergency medical technician. Vorih observed that the defendant still was sitting in the creek, unconscious and leaning against the open driver's side door. She revived the defendant, who appeared confused. After ascertaining that the defendant was able to use his legs, Vorih instructed him to get out of the creek and wait in the driver's seat of the car while she tended to the victim.

Because the victim was not breathing and had no pulse, the emergency personnel had to remove her from the vehicle to perform cardiopulmonary resuscitation (CPR) on her. The victim was a relatively large woman, approximately five feet eight inches tall and weighing approximately 200 pounds, and it took the concerted efforts of Nelson, Vorih and two or three firefighters to remove her from the car and carry her up the embankment. CPR was performed on the victim, who never regained consciousness. She was transported by ambulance to Hartford Hospital.

Vorih then tended to the defendant while they waited for a second ambulance to arrive to transport him to the hospital. She observed that the defendant was "much more lucid" than he had been earlier, and that he was able to answer her questions regarding his medical history. After the second ambulance arrived at the scene, Vorih and another emergency medical technician, Nicole Ruggiero, accompanied the defendant to Hartford Hospital. On the way to the hospital the ambu-

lance stopped to pick up Tonya Ford, a paramedic, who also accompanied the defendant to the hospital. In the course of the ride to the hospital, the defendant told both Vorih and Ruggiero that, before the accident, he had been at a friend's house, and that he had been driving to a bar in Southwick, Massachusetts. He also told them that he had been in a previous car accident five weeks earlier, and was taking prescription pain medication for injuries sustained in that accident. With regard to the previous accident, Vorih asked the defendant, "Were you driving then too?" The defendant responded, "Yeah, I was driving then, too." In addition, the defendant repeatedly told Vorih, Ruggiero and Ford that he had been driving the victim's car at the time of the accident at issue in the present case, and that he had been wearing his seat belt.

When the ambulance arrived at Hartford Hospital, the defendant was examined by a trauma team headed by Orlando C. Kirton, a general surgeon, who determined that the defendant had sustained several injuries, including a broken left clavicle, or collarbone, with accompanying abrasions and bruising to the upper left side of his chest, a broken bone in his right hand, two broken toes in his right foot and a bruise on his right hip. The defendant's blood was drawn, revealing that he had a blood alcohol level of 0.20, twice the legal limit. See footnote 3 of this opinion. The defendant told Robert Beginsky, a junior resident physician and part of the trauma team on duty at Hartford Hospital when the defendant was admitted, that he did not remember the accident or whether he had been the driver or the passenger. Beginsky noted that the defendant initially had stated that he thought he had been the passenger.

The victim was pronounced dead at Hartford Hospital at 1:42 a.m. on March 18, 2000. The cause of death was "multiple blunt traumatic injuries," including "multiple

rib and sternal fractures . . . ."[5] The defendant subsequently was charged by substitute information with manslaughter in the second degree with a motor vehicle in violation of § 53a-56b (a), operation of a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227a (a) (2) (A), and reckless driving in violation of § 14-222 (a). See footnotes 2 through 4 of this opinion.

At trial, the defendant did not contest that he was intoxicated on the evening of March 17, 2000. Rather, the defendant argued that the victim had been driving her car at the time of the accident and that he had been in the passenger seat. The state presented the testimony of Vorih, Ruggerio and Ford, all of whom testified that the defendant repeatedly had told them that he had been driving at the time of the accident. The state also presented the testimony of the defendant's estranged wife, Joan Christian, who testified, over the defendant's objection, that the defendant had told her that he had been driving at the time of the accident.

In addition, the state presented evidence concerning the circumstances of the accident. Specifically, Bourque testified that, on the basis of the "crush" damage to the vehicle and the location of paint chips from the victim's vehicle on the stone trestle wall of the railroad overpass, he determined that the vehicle had been moving at a speed of approximately fifty miles per hour when it hit the wall at a 73 degree angle, and that it then had rotated approximately 88 degrees before coming to rest at the bottom of the embankment. After comparing the circumstances of the accident to video recordings of professional crash tests, which were shown to the jury,

---

[5] A postmortem external examination by Ira Kanfer, a pathologist from the office of the chief medical examiner, indicated that the victim also had sustained multiple abrasions and lacerations to her face and right arm, some abrasions and lacerations to her left arm and abrasions and bruising to her lower legs.

Bourque characterized the collision as a frontal impact. On the basis of the crash test video recordings, the frontal impact collision, the weight of the victim, the victim's position in the passenger seat and Wilson's statement to the police that she had witnessed a male seated in the driver's seat, Bourque testified with a reasonable degree of certainty that the defendant had been driving at the time of the accident.

Bourque also testified, with the aid of a videotaped reenactment that was shown to the jury, that due to the intense damage to the vehicle, a woman of the victim's height and weight could not have moved from the driver's seat into the passenger's seat after the vehicle had come to rest. Finally, Bourque testified that the driver's side seat belt, which was shown to the jury, had suffered structural damage and was found in a retracted and "locked" position. In contrast, the passenger's side seat belt was not found in a locked position.

Ira Kanfer, a pathologist from the office of the chief medical examiner, testified that the injury to the victim's right arm was consistent with the type of injury that occurred to people located on the passenger side of motor vehicles. He also testified that the defendant's injury to his left clavicle and the bruising of his right hip were consistent with injuries that might be caused by a driver's side seat belt, "because the [driver's] seat belt comes over your left shoulder" and "[t]he buckle is put on the right hip."

John Kwasnoski, an accident reconstruction expert, testified that, once the car had hit the trestle wall, it took less then one second for the car to go down the embankment. Kwasnoski further testified that, under the circumstances of the accident, which he also characterized as a frontal impact, the "natural tendency" would be for the occupants of the car to move "very much forward and slightly to the right . . . ." There-

fore, it was Kwasnoski's opinion that, if the driver of the car had been wearing a seat belt, it would have been impossible for the driver to shift into the passenger seat. He further testified that, in the present case, there was no evidence that the driver had been unrestrained. Kwasnoski also testified that the occupants' slight movement to the right similarly would have been restricted by the frontal air bags, which had deployed during the accident. Finally, Kwasnoski testified that he did not believe that the victim could have hit the steering wheel—which was obstructed by an air bag— and "then somehow rebound[ed] from that and [gone] sideways and [gotten] both her upper body and her feet over on the other side of the console." Rather, he believed that the injuries to the victim's chest had been caused by her body moving forward, at a high rate of speed, into an air bag as it deployed at a rate of more than 100 miles per hour.

In the defendant's case-in-chief, Eugene Baron, an accident reconstruction expert, testified that, based on the severe damage to the interior of the vehicle and the injuries sustained by its occupants, it was "more probable" that the victim, and not the defendant, had been the driver. Specifically, Baron testified that the severe damage to the vehicle's steering column and steering wheel probably had been caused by "an occupant [who had] sustained very severe chest and facial trauma." He further stated that the steering wheel rim significantly had been bent toward the dashboard, indicating that the driver of the vehicle had not been wearing a seat belt. In addition, Baron stated that the driver's side seat belt had not sustained the type of deformation or other damage that customarily would be found after a high-speed collision. Baron testified that he had observed blood on the driver's side air bag, the center of the steering wheel rim, the dashboard and the passenger side door panel. He also testified that the damage to

the dashboard on the passenger's side of the vehicle was consistent with the injury to the defendant's right hand. Finally, Baron testified that the vehicle had rotated clockwise approximately 90 degrees after hitting the trestle wall, and that any "objects" in the car, including its occupants, would have been propelled toward the right side of the vehicle during the rotation.

The defendant also presented Robert Fisher, the defendant's treating physician, who testified that the injury to the defendant's left clavicle "could not have been caused by a seat belt with any reasonable medical probability." In addition, the defendant presented the expert testimony of Ricardo Sanchez, chairman and assistant director of emergency medicine at Saint Francis Hospital and Medical Center in Hartford, who testified that the victim's chest injury could not have been caused by an impact with a deploying air bag, but "may have" been caused by traumatic contact with "some blunt object, such as the steering wheel or some other part of the vehicle." Sanchez further testified that anxiety, intoxication or discomfort could cause a patient to make an incorrect statement to a treating paramedic.

The jury returned a verdict of guilty on all three counts. Thereafter, the trial court rendered judgment in accordance with the verdict and imposed on the defendant a total effective sentence of ten years and seven months imprisonment, suspended after eight years and seven months, five years probation and a $500 fine. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that the trial court improperly permitted the defendant's wife, Joan Christian, to testify, over his objection, regarding his confidential communications to her. The following facts and procedural history are relevant to our resolution of this claim. In the early hours of March 18, 2000,

Joan Christian was finishing her shift as a waitress at a restaurant in Avon when she received a telephone call informing her of the defendant's accident. She immediately went to Hartford Hospital, where she was greeted by Imperatrice, a chaplain and several physicians, who told her that the victim had died in the accident and that they believed that the defendant had been the driver of the vehicle involved. After consulting with the physicians, Joan Christian went, by herself, to the defendant's hospital room to inform him that the victim had died. When she arrived, the defendant quietly told her that he had been driving the vehicle, and he then made motions with his hands as though he were operating a steering wheel. Joan Christian quickly covered the defendant's hands with her own and "hushed" him, ostensibly to prevent him from making any further incriminating statements. Imperatrice and the physicians entered the room immediately thereafter. The defendant made no further incriminating remarks.

At trial, the state offered Joan Christian as a witness. She testified, upon voir dire, that at the time of trial, she and the defendant were separated and in the process of getting divorced. She further testified, however, that at the time of the accident in March, 2000, although she and the defendant still were living together, the marriage "was very rocky" and that it "went downhill" after the night of the accident. Finally, she testified that the marriage was over and that she did not feel that preserving the confidentiality of the defendant's statement would have any effect on repairing the marriage.

The defendant filed a motion in limine seeking to prevent Joan Christian from testifying about this communication on the ground that it was a privileged confidential marital communication. Specifically, the defendant argued that, although no Connecticut case expressly has recognized the existence of the marital communications privilege, the dictum of this court's

opinion in *State* v. *Littlejohn*, 199 Conn. 631, 649, 508 A.2d 1376 (1986), indicates that the privilege "has seemingly been accepted" by the courts of this state. The defendant further argued that the marital communications privilege was applicable to the present case because the communication had been "made during [the] marriage, out of the presence of third parties . . . ." In response, the state argued that, regardless of whether the privilege was available, the communication was not confidential, and thus, not privileged, because the defendant previously had made similar communications to Vorih, Ruggiero and Ford while riding in the ambulance to the hospital. The state further argued that application of the privilege would be inappropriate because the marriage between the defendant and his wife was "rocky" at the time of the communication, and that they were separated at the time of trial and in the process of getting divorced. The state argued, therefore, that any harm that disclosure might cause to the defendant's marital relationship was outweighed by the interest of the court and of society in "this judicial investigation of the truth."

The trial court denied the defendant's motion in limine. Although the court concluded that the marital communications privilege "may exist in certain circumstances," it determined that the privilege did not apply in the present case because the marriage irretrievably had broken down. Specifically, the court stated: "[B]ased on the dictum in *Littlejohn*, certainly this court will not say that no such privilege exists in Connecticut even though it is not set forth in a statute. I think our Supreme Court strongly indicates that the privilege does exist under some circumstances. Certainly there must be a marriage in effect; certainly the communication must be confidential, must have been made confidentially so that other people were not privy to it. And those circumstances seem to be present here. Although,

with respect to the confidential nature of the communication, I think that may be questioned in view of the evidence that we have heard, that the defendant essentially made the same inculpatory statement to other people before he made the statement to his wife. But I think the overriding factor in the circumstances of this case is that at the time the statement was made, but most importantly now, at the time of trial, the marriage relationship exists in name only, de jure, we might say, but not de facto. In my opinion, the marriage relationship has so broken down that at present the marital privilege, if it existed, has lost its purpose and must, therefore, give way to the competing strong interest of justice; namely, that relevant and material evidence be presented to a jury so that the jury can make a correct decision based on the facts." Consequently, Joan Christian testified concerning the communication.

On appeal, the defendant revives his argument to the trial court that the marital communications privilege is alive and well in Connecticut. Specifically, the defendant claims that, although neither the courts nor the legislature explicitly have recognized such a privilege, "the case law and the statutory history . . . show that this privilege is well recognized." The defendant therefore contends that the trial court improperly precluded the defendant from asserting the privilege concerning the communication, which had been made in confidence and while the couple was living together and in a legally valid marital relationship. In response, the state urges us not to recognize the marital communications privilege because "the cost of recognizing the common law . . . privilege exceeds its dubious benefits." Rather, the state contends, the legislature has enacted "a reasonable compromise" by codifying the separate and distinct adverse marital testimonial privilege in General Statutes § 54-84a.[6] The state further argues that,

---

[6] General Statutes § 54-84a provides: "If any person on trial for crime has a husband or wife, he or she shall be a competent witness but may elect

even if we recognize the marital communications privilege, it is inapplicable in the present case because the defendant's previous statements to Vorih, Ruggiero and Ford rendered his communication to his wife not confidential. We agree with the defendant.

We note at the outset that evidentiary privileges are governed by § 5-1 of the Connecticut Code of Evidence, which provides: "Except as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book, privileges shall be governed by the principles of the common law." The adverse spousal testimony privilege, which is codified at § 54-84a, belongs to the "witness spouse." *State* v. *Saia*, 172 Conn. 37, 43, 372 A.2d 144 (1976). Under that privilege, the husband or wife of a criminal defendant has a privilege not to testify against his or her spouse in a criminal proceeding, provided that the couple is married at the time of trial. See id.; *State* v. *Volpe*, 113 Conn. 288, 290, 155 A. 223 (1931); see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 5.34.1, pp. 325–26. The marital communications privilege, on the other hand, "permits an individual to refuse to testify, and to *prevent* a spouse or former spouse from testifying, as to any confidential communication made by the individual to the spouse during their marriage."[7] (Emphasis added.) *United States* v. *Rakes*, 136

or refuse to testify for or against the accused, except that either spouse who has received personal violence from the other or is the spouse of one who is charged with violation of any of sections 53-20, 53-21, 53-23, 53-304, 53a-70, 53a-70a, 53a-71 and 53a-83 to 53a-88, inclusive, may, upon his or her trial for offenses arising out of such personal violence or from violation of the provisions of any of said sections, be compelled to testify in the same manner as any other witness."

[7] "Although Connecticut has never ruled whether either spouse can invoke the privilege or only the communicating spouse can do so, the proper holder would seem to be the communicating spouse, since the privilege is based on the policy of encouraging free expression." C. Tait, supra, § 5.35.1, p. 329; see also 1 C. McCormick, Evidence (5th Ed. 1999) § 83, p. 336 (supporting argument that privilege belongs to communicating spouse). We are aware, however, that most state statutes confer the privilege upon *either* spouse

F.3d 1, 3 (1st Cir. 1998); see also *Trammel* v. *United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980) (marital communications privilege "protect[s] information privately disclosed between husband and wife in the confidence of the marital relationship"); 1 C. McCormick, Evidence (5th Ed. 1999) §§ 78 through 86, pp. 323–42; C. Tait, supra, §§ 5.35.1 through 5.35.5, pp. 328–31. Because the marital communications privilege is not addressed squarely by either the federal constitution, state constitution, General Statutes or Practice Book, it is governed by the principles of the common law. See Conn. Code Evid. § 5-1.

In *State* v. *Littlejohn*, supra, 199 Conn. 649, this court stated: "We have never explicitly held that confidential communications between husband and wife are privileged under the common law of this jurisdiction. Our early case of *State* v. *Hoyt*, 47 Conn. 518 (1880), strongly suggests that the *Hoyt* court felt that there was such a privilege. See [id.], 540.[8] The later case of *Spitz's Appeal*

to refuse to testify, prevent the other spouse from testifying, or both, concerning *any* confidential communication between them. Indeed, only five statutes expressly limit the privilege to the communicating spouse. See Ky. R. Evid. Ann. 504 (b) (Michie 2004) ("made by the individual to his or her spouse"); Me. R. Evid. 504 (b) (West 2003) ("from such person to the spouse"); N.M. R. Evid. Ann. 11-505 (B) (Michie 2003) ("by that person to that person's spouse"); R.I. Gen. Laws § 9-17-13 (1997) ("neither [spouse] shall be permitted . . . to disclose any communication made to him or her, by the other, during their marriage"); Tex. R. Evid. 504 (a) (2) (West 2003) ("made to the person's spouse"). In the present case, however, we need not decide whether the privilege is available to either spouse, or just to the communicating spouse, because the defendant was the communicating spouse and would be entitled to assert the privilege in either respect.

[8] "In *State* v. *Hoyt*, [supra, 47 Conn. 518], the defendant husband was charged with the murder of his father. At the trial, the state had possession of several letters written by the defendant to his wife, (how obtained or whether they were ever in the wife's possession did not appear), which were offered into evidence by the state as containing admissions inconsistent with the defendant's testimony in court with his insanity claim. Id., 540. The court admitted them over the defendant's objection that they were confidential communications between husband and wife.

"On appeal, this court found that doing so violated no rule of evidence and went on to say: The question was not whether the husband or wife

*from Commissioners,* 56 Conn. 184, 14 A. 776 (1887), clearly hypothesizes such a privilege." In *Littlejohn,* the defendant sought to assert the marital communications privilege to prevent his wife from testifying as to some twenty-five or thirty confidential communications. *State* v. *Littlejohn,* supra, 648–49. This court concluded that, "[a]lthough the confidential communications involved may have been admitted in error, any error was harmless." Id., 650. Accordingly, we did not answer the question of whether the marital communications privilege existed under our common law. We remarked, nonetheless, that the privilege for confidential marital communications "commends itself to judicial acceptance." Id., 649.

"[T]he rules of privilege, of which the most familiar are the rule protecting against self-incrimination and those shielding the confidentiality of communications between husband and wife, attorney and client, and physician and patient, are not designed or intended to facilitate the fact-finding process or to safeguard its integrity. Their effect instead is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light." 1 C. McCormick, supra, § 72, p. 299. Privileges have "the effect of withholding relevant information from the factfinder . . . . Accordingly, although a . . . privilege must be applied so as to effectuate its purpose, it is to be applied cautiously and with circumspection because it impedes the truth-seeking function

could have been compelled to produce the evidence, but whether, when the letters fell into the hands of a third person, *the sacred shield of the privilege went with them.* We think not. 1 Greenl. Ev., § 284a. . . . [*State* v. *Hoyt,* supra, 47 Conn. 540].

"The citation to Professor Greenleaf's treatise by the *Hoyt* court is provocative in view of the fact that Greenleaf had earlier, in 1842, announced the existence of a distinct privilege [apart from marital status] for marital communications . . . . McCormick, Evidence (3d Ed. 1984) § 78, pp. 188–89." (Emphasis in original; internal quotation marks omitted.) *State* v. *Littlejohn,* supra, 199 Conn. 649 n.13.

of the adjudicative process." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 724, 759 A.2d 995 (2000). A privilege should be recognized, therefore, only if four essential conditions have been met: "(1) The communications must originate in a confidence that they will not be disclosed. (2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties. (3) The relation must be one which in the opinion of the community ought to be sedulously fostered. (4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation." 8 J. Wigmore, Evidence (1961) § 2285, p. 527.

The principles underlying the marital communications privilege are well recognized. "The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails. . . . Hence it is that the privilege with respect to communications extends to the testimony of husband or wife even though the different privilege, excluding the testimony of one against the other, is not involved." (Citations omitted.) *Wolfle* v. *United States*, 291 U.S. 7, 14, 54 S. Ct. 279, 78 L. Ed. 617 (1934). The marital communications privilege protects "information privately disclosed between husband and wife in the confidence of the marital relationship—once described . . . as 'the best solace of human existence.' " *Trammel* v. *United States*, supra, 445 U.S. 51, quoting *Stein* v. *Bowman*, 38 U.S. (13 Pet.) 209, 223 (1839). The privilege has been described as "almost sacrosanct . . . ." *Johnson* v. *United States*, 616 A.2d 1216, 1224 (D.C. App. 1992), cert. denied, 507 U.S. 996, 113 S. Ct. 1611, 123 L. Ed. 2d 172 (1993). "[T]he primary purpose of the

confidential marital communication privilege is to foster marital relationships by encouraging confidential communication between spouses . . . ." *Curran* v. *Pasek*, 886 P.2d 272, 276 (Wyo. 1994). The privilege "permit[s] a husband and wife to communicate freely with one another without fear that their communications will be used against them at some future date." G. Sodaro & P. Wilson, "Spousal Privileges," in 2 Testimonial Privileges (S. Stone & R. Taylor eds., 2d Ed. 1995) § 5.07, p. 5-11. "We encourage married people to confide in each other by protecting their statements from later scrutiny in court." *United States* v. *Lea*, 249 F.3d 632, 641 (7th Cir. 2001).

It therefore is apparent that the purposes underlying the marital communications privilege asserted by the defendant are quite different from those supporting the separate and distinct privilege against adverse spousal testimony relied upon by the state. "The [adverse spousal testimony] privilege looks forward with reference to the particular marriage at hand: the privilege is meant to protect against the impact of the testimony on the marriage. The marital communications privilege in a sense, is broader and more abstract: it exists to insure that spouses generally, prior to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." *United States* v. *Byrd*, 750 F.2d 585, 590 (7th Cir. 1984); see also *State* v. *Adamson*, 72 Ohio St. 3d 431, 433, 650 N.E.2d 875 (1995) ("[s]pousal privilege and spousal competency are distinct legal concepts which interrelate and provide two different levels of protection for communications between spouses"). We therefore are not persuaded by the state's assertion that the privilege against adverse spousal testimony, codified at § 54-84a, alone is sufficient to protect the interests of open communication in the marital relationship. Accordingly, we reaffirm our statement in *State*

v. *Littlejohn,* supra, 199 Conn. 649, that the marital communications privilege "commends itself to judicial acceptance," and we expressly accept that privilege as a fixture of our common law.

Our conclusion, recognizing the existence of a privilege for confidential marital communications, aligns us with every other jurisdiction in the country.[9] Connecticut is unique among its sister states, which each have a statute or a rule of evidence expressly providing for the privilege.[10] Even when the marital communications

[9] The legislature, moreover, implicitly has recognized the existence of a separate and distinct privilege for confidential marital communications. See General Statutes § 46b-129a (3) ("the privilege against the disclosure of communications between husband and wife shall be inapplicable [to proceedings concerning commitment of child or youth] and either may testify as to any relevant matter"); General Statutes (Rev. to 1997) § 46b-203 ("[l]aws attaching a privilege against the disclosure of communications between husband and wife" were inapplicable to proceedings for spousal support), repealed, effective January 1, 1998, by Public Acts, Spec. Sess., June, 1997, No. 97-1, §§ 74 and 75.

[10] See Ala. R. Evid. 504 (1996); Alaska R. Evid. 505 (b) (West 2003); Ariz. Rev. Stat. Ann. § 12-2232 (West 2003); Ark. Court Rules Ann., Evid. 504 (LexisNexis 2003); Cal. Evid. Code § 980 (Deering 1986); Colo. Rev. Stat. Ann. § 13-90-107 (LexisNexis 2003); Del. Rules Ann. 504 (Michie 2003); D.C. Code Ann. § 14-306 (b) (2001); Fla. Stat. c. 90.504 (2002); Ga. Code Ann. § 24-9-21 (1) (1995); Haw. R. Evid. 505 (b) (2003); Idaho Code § 9-203 (1) (Michie 1998); 725 Ill. Comp. Stat. Ann. § 5/115-16 (West 2002); Ind. Code Ann. § 34-46-3-1 (4) (Lexis 1998); Iowa Code § 622.9 (2001); Kan. Stat. Ann. § 60-423 (b) (1994); Ky. R. Evid. Ann. 504 (b) (Michie 2004); La. Code Evid. Ann. art. 504 (B) (West 1995); Me. R. Evid. 504 (West 2003); Md. Code Ann., Cts. & Jud. Proc. § 9-105 (2002); Mass. Gen. Laws Ann. c. 233, § 20 (LexisNexis 2000); Mich. Comp. Laws § 600.2162 (7) (2001); Minn. Stat. Ann. § 595.02 (1) (a) (West 2000); Miss. R. Evid. 504 (1999); Mo. Rev. Stat. § 546.260 (1) (2000); Mont. Code Ann. § 26-1-802 (2003); Neb. Rev. Stat. § 27-505 (1) (1995); Nev. Rev. Stat. 49.295 (1) (b) (2001); N.H. R. Evid. 504 (2003-2004); N.J. Stat. Ann. § 2A:84A-22 (West 1994); N.M. R. Evid. Ann. 11-505 (Michie 2003); N.Y. C.P.L.R. 4502 (b) (McKinney 1992); N.C. Gen. Stat. § 8-57 (c) (2003); N.D. Court Rules Ann., Evid. 504 (LexisNexis 2002-2003); Ohio Rev. Code Ann. §§ 2317.02 (D) and 2945.42 (West 1994); Okla. Stat. Ann. tit. 12, § 2504 (West 1993); Or. Rev. Stat. § 40.255 (2) (1988); 42 Pa. Cons. Stat. Ann. § 5914 (West 2000); R.I. Gen. Laws § 9-17-13 (1997); S.C. Code Ann. § 19-11-30 (Law. Co-op. 1985); S.D. Codified Laws § 19-13-13 (Michie 1995); Tenn. Code Ann. § 24-1-201 (c) (2000); Tex. R. Evid. 504 (a) (West 2003); Utah Code Ann. § 78-24-8 (1) (a) (2002); Vt. R. Evid. 504 (LexisNexis 2003); Va. Code Ann.

privilege is a product of legislative fiat, however, courts have continued to recognize the strong common-law roots of the privilege. See, e.g., *State* v. *Gianakos*, 644 N.W.2d 409, 415 (Minn. 2002) ("despite the statutory nature of Minnesota's marital privilege, its roots are in the common law"); *State* v. *Holmes*, 330 N.C. 826, 828, 412 S.E.2d 660 (1992) ("[t]he common law has long recognized a privilege protecting confidential marital communications, that is, information privately disclosed between a husband and wife in the confidence of the marital relationship"); see also 1 C. McCormick, supra, § 78, p. 325 ("statutes protecting marital communications from disclosure are declaratory of the common law"). The federal courts, moreover, continue to recognize and apply the privilege as a matter of federal common law. See *Trammel* v. *United States*, supra, 445 U.S. 45 n.5, 51 (recognizing marital communications privilege); *United States* v. *Westmoreland*, 312 F.3d 302, 306 (7th Cir. 2002) ("[t]he marital communications privilege is well-established in the federal courts"), cert. denied, 538 U.S. 1042, 123 S. Ct. 2094, 155 L. Ed. 2d 1077 (2003); see also Fed. R. Evid. 501 (providing that "privileges . . . shall be governed by the principles of the common law").

As we have stated, the marital communications privilege permits an individual to prevent his or her spouse or former spouse from testifying as to any confidential communication made by the individual to the spouse during their marriage. In the present case, it is uncontroverted that the statement made by the defendant to his wife, along with the accompanying gesticulations, were "communications."[11] Accordingly, we must determine:

§ 8.01-398 (A) (Michie 2000); Wash. Rev. Code § 5.60.060 (1) (2002); W. Va. Code § 57-3-4 (Michie 1997); Wis. Stat. § 905.05 (2001-2002); Wyo. Stat. Ann. § 1-12-101 (a) (iii) (LexisNexis 2003).

[11] In general, for purposes of the marital communications privilege, the word "communications" includes "utterances or expressions intended to convey information between spouses." *In re Witness Before the Grand Jury*, 791 F.2d 234, 239 (2d Cir. 1986). "[A]lthough communication need not involve

(1) whether the defendant had made those communications to his wife during their marriage; and (2) whether those communications were confidential.

We begin our analysis by determining whether the defendant had made the communications to his wife while the couple were in a valid marital relationship. In the present case, the trial court determined that the marital communications privilege, if it existed, was inapplicable because "at the time the statement was made, but most importantly now, at the time of trial," the defendant's marriage irretrievably had broken down. The state contends that the trial court's decision was proper, because the defendant's marriage was "beyond repair" both at the time the statement was made and at the time of trial.[12] The defendant claims that the trial court improperly refused to apply the privilege. Specifically, he claims that the trial court's focus was imprecise because the privilege attaches at the time that the confidential statement was made, and if made during the marriage, the privilege survives the dissolution of the marriage. We agree with the defendant.

"[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When,

words, it must involve more than observation by one person of the conduct of another; it must involve the attribution of a message or meaning to that conduct. Whether particular sounds, gestures, or actions constitute 'communications' depends in large measure on the context in which they occur." *Commonwealth* v. *Chiappini*, 566 Pa. 507, 518, 782 A.2d 490 (2001); see also 1 C. McCormick, supra, § 79, pp. 327–29; C. Tait, supra, § 5.35.3, p. 330.

[12] At oral argument before this court, however, the state conceded that the application of the marital communications privilege focuses on the marital relationship at the time of the communication, and not at the time of trial.

however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 7, 826 A.2d 1088 (2003). In the present case, the trial court's determination that the marital communications privilege does not apply to existent marriages that irretrievably have broken down was a conclusion of law. Thus, our limited task, in connection with the first prong of the test, is to decide whether, based on the facts set forth in the record, the trial court's conclusion of law was legally and logically correct. See id.

For the marital communications privilege to apply, the communications must have been made in confidence *during the marriage*. Once the marital communications privilege has attached, moreover, it continues to survive even after the marriage has ended. See *Pereira* v. *United States*, 347 U.S. 1, 6, 74 S. Ct. 358, 98 L. Ed. 435 (1954) ("divorce . . . does not terminate the privilege for confidential marital communications"); see also 1 C. McCormick, supra, § 85, p. 339 ("about one-half of the statutes codifying the [marital communications] privilege explicitly provide that it continues after death or divorce");[13] C. Tait, supra, § 5.35.4, p.

---

[13] Almost one half of the marital communications privilege statutes codified by our sister states expressly provide that the privilege continues after the end of the marriage. See Alaska R. Evid. 505 (b) (1) (West 2003); Ariz. Rev. Stat. Ann. § 12-2232 (West 2003); Cal. Evid. Code § 980 (Deering 1986); Colo. Rev. Stat. Ann. § 13-90-107 (1) (a) (II) (LexisNexis 2003); Fla. Stat. c. 90.504 (1) (2002); Idaho Code § 9-203 (1) (Michie 1998); Iowa Code § 622.9 (2001); La. Code Evid. Ann. art. 504 (B) (West 1995); Mich. Comp. Laws § 600.2162 (7) (2001); Minn. Stat. Ann. § 595.02 (1) (a) (West 2000); Miss. R. Evid. 504 (b) (1999); Mont. Code Ann. § 26-1-802 (2003); Neb. Rev. Stat. § 27-505 (1) (1995); Nev. Rev. Stat. 49.295 (1) (b) (2001); N.J. Stat. Ann. § 2A:84A-22 (West 1994); Ohio Rev. Code Ann. § 2317.02 (D) (West 1994); Tex. R. Evid. 504 (a) (2) (West 2003); Utah Code Ann. § 78-24-8 (1) (a) (2002); Vt. R. Evid. 504 (b) (LexisNexis 2003); Va. Code Ann. § 8.01-398 (A) (Michie 2000); Wash. Rev. Code § 5.60.060 (1) (2002); W. Va. Code § 57-3-4

330 (marital communications privilege continues after divorce and death of spouse). In other words, the privilege focuses on the marital relationship between the spouses *at the time that the communication was made*, and not at the time of trial.

As we have noted, the marital communications privilege was founded upon the strong policy of preserving the marital relationship through the fostering of confidences between spouses. This policy applies with equal force to preserve *all* legally valid marriages, irrespective of marital difficulties.[14] "Indeed, the reasons justifying

(Michie 1997); Wis. Stat. § 905.05 (1) (2001-2002).

In the absence of such statutory language, many courts have recognized, under the common law, that the privilege attaches to confidential communications made during the marriage and continues to apply after the marriage has ended by reason of death or divorce. See, e.g., *Hall v. State*, 720 So. 2d 1043, 1048 (Ala. Crim. App. 1998) ("the [marital communications] privilege survives both divorce and death" [internal quotation marks omitted]); *Shepherd v. State*, 257 Ind. 229, 234, 277 N.E.2d 165 (1971) ("divorce does not remove the privilege as to confidences which were communicated between the parties during their coverture"); *State v. Glover*, 219 Kan. 54, 57, 547 P.2d 351 (1976) ("the privilege given to an accused against disclosure of confidential communications made during marriage survives dissolution of the marriage"); *Commonwealth v. May*, 540 Pa. 237, 249, 656 A.2d 1335 (1995) (marital communications privilege "remains in force even after death or divorce"); *Curran v. Pasek*, supra, 886 P.2d 276 ("[T]he confidential marital communications privilege survives the death of either spouse. To rule otherwise would thwart the very purpose of the . . . privilege.").

[14] Federal courts have held that the marital communications privilege does not apply to married couples who, at the time of the communication, were permanently separated; *United States v. Singleton*, 260 F.3d 1295, 1298–99 (11th Cir. 2001); *United States v. Porter*, 986 F.2d 1014, 1018–19 (6th Cir.), cert. denied, 510 U.S. 933, 114 S. Ct. 347, 126 L. Ed. 2d 312 (1993); *United States v. Frank*, 869 F.2d 1177, 1179 (8th Cir.), cert. denied, 493 U.S. 839, 110 S. Ct. 121, 107 L. Ed. 2d 82 (1989); *United States v. Byrd*, supra, 750 F.2d 593; or were permanently separated and had no hope of reconciling. *United States v. Roberson*, 859 F.2d 1376, 1381 (9th Cir. 1988); *In re Witness Before the Grand Jury*, 791 F.2d 234, 238 (2d Cir. 1986).

The state, relying on one such case, *United States v. Singleton*, supra, 260 F.3d 1300, contends in its brief that "[w]hen a marriage . . . is beyond repair, suppressing relevant evidence, when the spouse is willing to testify, does nothing to support the marriage." In *Singleton*, however, the court expressly held that "society's interest in protecting the confidentiality of

the marital communications privilege—encourag[ing] marital partners to share their most closely guarded secrets and thoughts, thus adding an additional measure of intimacy and mutual support to the marriage—apply with equal force to married couples who, despite the appearance to outsiders of an irretrievably broken marriage, may still share hopes of reconciliation." (Internal quotation marks omitted.) *Blazek* v. *Superior Court*, 177 Ariz. 535, 539–40, 869 P.2d 509 (App. 1994). We conclude, therefore, that the marital communications privilege applies to the present case.

Although the defendant's marriage may have been acrimonious at the time that he had made the communications to his wife, the marital communications privilege nonetheless was valid. Furthermore, because the focus is on the status of the marital relationship at the time of the communication, their marital status at the time of trial was immaterial. Accordingly, we conclude that the defendant's communications to his wife, made while the couple was living together as husband and wife, were subject to the marital communications privilege insofar as those communications were confidential.

We next focus our analysis on the question of whether the communications were confidential. The state contends that the trial court's denial of the defendant's

the relationships of *permanently separated* spouses is outweighed by the need to secure evidence in the search of truth that is the essence of a criminal trial, and that proof of *permanent separated* states at the time of the communication between the defendant and the defendant's spouse renders the communications privilege automatically inapplicable." (Emphasis added; internal quotation marks omitted.) *United States* v. *Singleton*, supra, 1299. *Singleton*, and cases like it, are not instructive in the present case, however, because it is uncontroverted that the defendant and his wife were living together and were not permanently separated at the time of the communications. We do not decide, therefore, whether a confidential communication made during a marriage but while the couple was permanently separated shall be protected by the privilege.

motion in limine can be affirmed, nevertheless, because the marital communications were not confidential. Specifically, the state relies on the defendant's previous, similar statements to Vorih, Ruggerio and Ford. We disagree.

We note, at the outset, that the determination of the second factor, that is, whether a communication was confidential, depends on the facts of the particular case. It is axiomatic that the marital communications privilege protects only those communications that are confidential.[15] *Wolfle* v. *United States*, supra, 291 U.S. 14.

---

[15] There is little controversy over the requirement of confidentiality. Most statutes expressly require that, to be privileged, the communication must be confidential or privately made. See Ala. R. Evid. 504 (1996); Alaska R. Evid. 505 (b) (West 2003); Ark. Court Rules Ann., Evid. 504 (LexisNexis 2003); Colo. Rev. Stat. Ann. § 13-90-107 (1) (a) (II) (LexisNexis 2003); Del. Uniform R. Evid. 504 (1991); D.C. Code Ann. § 14-306 (b) (2001); Fla. Stat. c. 90.504 (2002); Haw. R. Evid. 505 (b) (2003); Kan. Stat. Ann. § 60-423 (b) (1994); Ky. R. Evid. Ann. 504 (b) (Michie 2004); La. Code Evid. Ann. art. 504 (B) (West 1995); Me. R. Evid. 504 (b) (West 2003); Md. Code Ann., Cts. & Jud. Proc. § 9-105 (2002); Mass. Gen. Laws Ann. c. 233, § 20 (LexisNexis 2000); Miss. R. Evid. 504 (1999); Mo. Rev. Stat. § 546.260 (1) (2000); Neb. Rev. Stat. § 27-505 (1) (1995); N.J. Stat. Ann. § 2A:84A-22 (West 1994); N.M. R. Evid. Ann. 11-505 (Michie 2003); N.Y. C.P.L.R. 4502 (b) (McKinney 1992); N.C. Gen. Stat. § 8-57 (c) (2003); N.D. Court Rules Ann., Evid. 504 (LexisNexis 2002-2003); Ohio Rev. Code Ann. §§ 2317.02 (D) and 2945.42 (West 1994); Okla. Stat. Ann. tit. 12, § 2504 (West 1993); Or. Rev. Stat. § 40.255 (2) (1988); 42 Pa. Cons. Stat. Ann. § 5914 (West 2000); S.D. Codified Laws § 19-13-13 (Michie 1995); Tenn. Code Ann. § 24-1-201 (c) (2000); Tex. R. Evid. 504 (a) (West 2003); Vt. R. Evid. 504 (2003); Va. Code Ann. § 8.01-398 (A) (Michie 2000); W. Va. Code § 57-3-4 (Michie 1997); Wis. Stat. § 905.05 (2001-2002). "However, even where the words used are 'any communication' or simply 'communications,' the notion that the privilege is born of the 'common law' and the fact that the pre-statutory descriptions of the privilege had clearly based it upon the policy of protecting confidences, have actuated most courts to read into such statutes the requirement of confidentiality." 1 C. McCormick, supra, § 80, pp. 329-30.

The federal courts require, as a matter of federal common law, that the communication be confidential. *Wolfle* v. *United States*, supra, 291 U.S. 14 ("wherever a communication . . . was obviously not intended to be confidential it is not a privileged communication"); *Securities & Exchange Commission* v. *Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997) (for privilege to apply, "communication must have been made in confidence").

"Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private." *Pereira* v. *United States*, supra, 347 U.S. 6; see also *State* v. *Smith*, 384 A.2d 687, 691 (Me. 1978) (following "the near universal rule . . . that all marital communications are presumed to be confidential, and the party seeking to introduce the evidence must overcome the presumption" [citations omitted]). The state, therefore, as the party seeking to introduce the marital communication into evidence, bears the burden of overcoming the presumption of confidentiality by proving that the communication between the defendant and his wife was not confidential. See *Blau* v. *United States*, 340 U.S. 332, 333, 71 S. Ct. 301, 95 L. Ed. 170 (1951) ("[M]arital communications are presumptively confidential. . . . The Government made no effort to overcome the presumption." [Citations omitted.]); *Commonwealth* v. *Hancharik*, 534 Pa. 435, 442, 633 A.2d 1074 (1993) ("[c]ommunications between husbands and wives are presumed to be confidential, and the party opposing application of the rule disqualifying such testimony bears the burden of overcoming this presumption"); *State* v. *Witchey*, 388 N.W.2d 893, 895 (S.D. 1986) ("[w]ith the introduction of evidence of private communications between spouses goes the burden of showing that either the nature of the communication or the circumstances under which it occurred render the communication not privileged").

We recognize that there is a split of authority concerning the test to be applied in determining whether a communication was confidential. Under the traditional view, a communication is confidential if the communicator, at the time of the communication, subjectively *intended* that the content of the communication not be disclosed to third parties or the public. See, e.g., *Hall* v. *State*, 720 So. 2d 1043, 1047 (Ala. Crim. App. 1998);

*State* v. *Levi*, 67 Haw. 247, 250, 686 P.2d 9 (1984); see also "Developments in the Law—Privileged Communications," 98 Harv. L. Rev. 1450, 1573 (1985) (" '[c]onfidentiality' usually requires that the communicator subjectively intend that the communication not be disclosed"). Some jurisdictions, however, apply an objective test, wherein a communication is confidential if, at the time of the communication, the communicator could have had a *reasonable expectation of confidentiality*. See, e.g., *State* v. *Benner*, 284 A.2d 91, 109 (Me. 1971); *State* v. *McMorrow*, 314 N.W.2d 287, 289 (N.D. 1982); *Commonwealth* v. *May*, 540 Pa. 237, 250, 656 A.2d 1335 (1995). We think that the latter standard is the better approach, because it is consistent with our prior case law construing the distinct, but analogous, privilege for attorney-client communications. See *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 157, 757 A.2d 14 (2000) ("statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality" [internal quotation marks omitted]). Accordingly, a marital communication is considered confidential if, at the time of the communication, the holder of the privilege had a reasonable expectation of confidentiality.[16]

Under either test, however, the party offering the marital communication usually can overcome the pre-

---

[16] We note, however, that quite often "[i]n application . . . [the objective reasonable expectations] test differs little from the subjective [intentions] test." "Developments in the Law—Privileged Communications," supra, 98 Harv. L. Rev. 1573. Indeed, the concept of intention has appeared in our jurisprudence concerning the attorney-client privilege. See *Pagano* v. *Ippoliti*, 245 Conn. 640, 650, 716 A.2d 848 (1998) ("[I]f a client calls into [a] conference with [an] attorney one of the client's agents, and matters are discussed which bear on the agent's rights against the client, those communications would not be privileged. . . . The rationale in both instances is that the individuals involved did not *intend* to keep their communications secret from one another." [Citation omitted; emphasis added; internal quotation marks omitted.]).

sumption of confidentiality through evidence that the communication had been made in the presence of a third party. See, e.g., *United States* v. *Taylor*, 92 F.3d 1313, 1331–32 (2d Cir. 1996) (evidence that third person had been in room with defendant and spouse overcame presumption of confidentiality), cert. denied, 519 U.S. 1093, 117 S. Ct. 771, 136 L. Ed. 2d 717 (1997); *State* v. *Levi*, supra, 67 Haw. 250 (defendant's statements to wife in presence of third parties not confidential); *State* v. *McMorrow*, supra, 314 N.W.2d 288–89 (marital communications not confidential when made while couple in car with third person). Even when no third party actually was present, the presumption of confidentiality may be rebutted by evidence that the communication was intended or expected to be disclosed to a third party or to the public. See, e.g., *In re Witness Before the Grand Jury*, 791 F.2d 234, 239 (2d Cir. 1986) (communications concerning defendant's bank accounts, real estate transactions, credit cards, car registration, and payment of insurance premiums not confidential because defendant knew information was or would be disclosed to third parties or public); *United States* v. *McCown*, 711 F.2d 1441, 1452–53 (9th Cir. 1983) (check written by wife on husband's behalf overcame presumption that husband's instruction to wife to write check intended as confidential); *Grulkey* v. *United States*, 394 F.2d 244, 246 (8th Cir. 1968) (husband's letters to wife not confidential wherein husband knew wife would need help reading them); *Yoder* v. *United States*, 80 F.2d 665, 667–68 (10th Cir. 1935) (husband's note to wife not confidential when written on large cardboard and conspicuously posted); see also "Developments in the Law—Privileged Communications," supra, 98 Harv. L. Rev. 1573 ("even if the communications were made in private, the presumption of confidentiality may be rebutted by showing that the communicant intended the statements to be disclosed to specific third parties or to the public").

In the present case, the trial court made no determination as to whether the defendant's communications to his wife were confidential.[17] Rather than resolving the question of confidentiality, the trial court concluded that "the overriding factor" in its decision to admit the testimony was "that at the time the statement was made, but most importantly now, at the time of trial, the marriage relationship exists in name only, de jure, we might say, but not de facto." Thus, the trial court did not conclude that the state had overcome the presumption of confidentiality, nor did it conclude that the communication was not confidential. Similarly, the state has not presented any persuasive reason on appeal that would lead us to conclude that the communication was not confidential, that is, that the defendant did not have a reasonable expectation of confidentiality. Therefore, we do not agree with the state's contention that the trial court's decision to allow Joan Christian's testimony was proper.

Our determination that the trial court improperly allowed Joan Christian to testify, however, does not end our inquiry. We also must decide whether the impropriety was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected

---

[17] We reiterate that the trial court stated: "Certainly there must be a marriage in effect; certainly the communication must be confidential, must have been made confidentially so that other people were not privy to it. And those circumstances seem to be present here. Although, with respect to the confidential nature of the communication, I think that may be questioned in view of the evidence that we have heard, that the defendant essentially made the same inculpatory statement to other people before he made the statement to his wife."

the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 667, 835 A.2d 895 (2003). For purposes of the present case, we need not choose between the two formulations or decide whether there is any functional difference between them because we conclude that the defendant has not satisfied his burden of proving harm under either formulation of the standard.

The defendant claims that the admission of Joan Christian's testimony concerning the privileged communication was harmful because that testimony was "critical to the state's case." The defendant contends that it is more probable than not that the jury accorded greater weight to Joan Christian's testimony than to other testimony in the case. Specifically, the defendant points out that he had made his statements to Vorih, Ruggiero and Ford, indicating that he was the driver, when he was still "confused" and intoxicated, and that those statements later were clarified by the testimony of Kirton that the defendant, upon arriving at the hospital, initially believed that he had been the passenger. The defendant's communications to Joan Christian, on the other hand, were made after his intoxication and confusion had receded. In addition, the defendant argues that testimony concerning marital communications frequently is accorded greater weight than other types of testimony. See, e.g., *Hall* v. *State*, supra, 720 So. 2d 1049 ("a jury might reasonably be expected to accord substantial weight to . . . a confession, in part because of the very fact that it was made privately by a husband to his wife").

The state contends, in response, that the defendant cannot meet his burden. Specifically, the state argues that "it is unlikely that the jury placed much reliance"

upon the privileged testimony because Joan Christian admitted on cross-examination that she and the defendant were getting divorced, that they were involved in a contentious custody dispute and that their relationship was poor. In addition, the state points out that Joan Christian's testimony was cumulative to the testimony of Vorih, Ruggerio and Ford concerning the defendant's similar statements to them that he was the driver. Finally, the state points to the "overwhelming" physical evidence establishing that the defendant was the driver of the vehicle at the time of the accident.

We agree with the state that the admission of the privileged testimony constituted harmless error. As the state correctly points out, Joan Christian's testimony that the defendant had admitted to operating the vehicle is merely cumulative of the testimony of Vorih, Ruggiero and Ford regarding the defendant's similar admission. "It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 639, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). Moreover, although the defendant presented some evidence that he was not the driver, the state presented an abundance of evidence to support a finding that the defendant had indeed been the driver. Specifically, Wilson testified that she heard a male voice coming from a person sitting in the driver's seat, behind the steering wheel. Bourque testified that, when he arrived at the scene of the accident, the victim "was in the passenger seat with her buttocks fully in the seat." Bourque also testified that, based upon his reenactment of the accident, he had determined that a woman of the victim's height and weight could not have moved from the driver's seat into the passenger's seat. The state also presented

Kwasnoski, who testified that, under the circumstances of the accident, the "natural tendency" would have been for the occupants of the car to move "very much forward and slightly to the right . . . ." Finally, the state presented evidence that the injuries to the defendant's left clavicle were consistent with those that might be caused to a driver by a restraining device, such as the driver's side seat belt. In light of the volume of evidence presented by the state indicating that the defendant had been driving at the time of the accident, we cannot say in the present case that it was more probable than not that the erroneously admitted privileged testimony affected the jury's verdict, nor can we say that any prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. Accordingly, we conclude that the improper admission of the privileged testimony constituted harmless error.

## II

The defendant next claims that the trial court improperly precluded Victoria Bobryk from testifying with regard to a conversation that she had overheard between Joan Christian and her attorney. Specifically, the defendant claims that Bobryk's testimony concerned the effect that the defendant's conviction would have had on Joan Christian's claim for custody of the couple's child, and was therefore relevant impeachment evidence.

The following additional facts are relevant to our resolution of this claim. As we previously have discussed, Joan Christian testified at trial that the defendant had told her that he had been driving the vehicle at the time of the accident. See part I of this opinion. On cross-examination, the defendant questioned her concerning her truthfulness in a prior, unrelated criminal proceeding in Connecticut Superior Court, wherein

Joan Christian herself had been charged with driving under the influence. Specifically, the defendant asked her if she had told the court in that proceeding that she had no prior convictions and never had participated in an alcohol education program, despite the fact that she had an earlier conviction for driving under the influence in Massachusetts and had participated in that state's alcohol education program. Joan Christian admitted that she had not been entirely truthful in that proceeding, but explained that she had thought that the court's questions in that proceeding pertained solely to convictions in Connecticut and the Connecticut alcohol education program.

In connection with questions regarding her marriage to the defendant, Joan Christian testified that the defendant had abandoned her and their young son in October, 2000, and that she thereafter had moved with the son to Massachusetts. Upon further cross-examination, she testified that she had initiated court proceedings in Massachusetts regarding the defendant's visitation rights with their son, and that in the court file for those proceedings she had enclosed newspaper articles concerning the charges against the defendant in the present case. Joan Christian further testified that the defendant had initiated divorce and child custody proceedings in Connecticut in February or March, 2001. She admitted that, in a discussion with the defendant concerning those proceedings, she had told him that she had been "keeping up" with the status of the present case. She further admitted that she had contacted the state's attorney and had given a statement to the Suffield police department concerning the present case. Joan Christian acknowledged that her divorce and child custody proceedings against the defendant were "hotly contested," and that her conflicts with him had escalated over time. She also admitted that she was not "too happy" with the fact that the defendant had left her without paying

their bills, although she had given him money for that purpose. Nonetheless, she stated that she was not angry with him, and that she was testifying against him in the present case because it was "the right thing to do."

Finally, the defendant questioned Joan Christian regarding a conversation she had with her attorney in the Enfield courthouse in May, 2001. Specifically, the defendant asked her if she recalled having had a conversation with her attorney, who had represented her in both the driving under the influence proceeding and the divorce and child custody proceedings, while they were in a small vestibule of the Enfield courthouse following the pretrial conference in the driving under the influence proceeding. Joan Christian testified that she did not remember that particular conversation. The defendant then asked her if she recalled discussing with her attorney the effect that the defendant's conviction in the present case might have on the divorce and child custody proceedings, and she testified that she did not.

After the close of the state's case-in-chief, the defendant attempted to have Bobryk testify. In making this proffer, he explained that Bobryk, a former legal intern for the defendant's attorney in the present case, had gone to the Enfield courthouse, at the attorney's direction, to observe Joan Christian in her driving under the influence proceeding. Specifically, the defendant's attorney had told Bobryk "to make a note of" whether Joan Christian was driving a car when she left the proceeding, because "these were things that were deemed to be relevant in the divorce litigation." After the proceeding, Bobryk waited in the small vestibule of the courthouse to attempt to see if Joan Christian left the courthouse driving a vehicle. At this point, Joan Christian purportedly entered the vestibule with her attorney and discussed with him the impact that the defendant's conviction in the present case would have on the divorce proceeding. In particular, it was acknowledged

that, if the defendant was convicted in the present case, "there would be no further question about him . . . getting custody of their child." Joan Christian's attorney purportedly asked her about the status of the defendant's criminal proceeding, and she told him that she did not know. She and her attorney then went to the clerk's office to check on the status.

The state objected to the admission of Bobryk's testimony on grounds that its admission would violate the evidentiary rule against impeaching a witness based on extrinsic evidence concerning a collateral matter, and because Joan Christian's communications with her attorney were protected by the attorney-client privilege. The defendant argued, in response, that Bobryk's testimony was not extrinsic evidence of a collateral matter, because Joan Christian's "efforts to use [the present case] to bolster her [child] custody and divorce litigation" were relevant to her credibility as a witness in the present case.[18]

The trial court sustained the state's objection and excluded the proffered testimony "for two essential reasons. One is I believe it is collateral. I don't think there's any way you could characterize the evidence that . . . Bobryk would offer here as material to, or even relevant, to any of the issues raised by this case. Secondly . . . I believe [that] . . . under the peculiar circumstances of this encounter as set forth in the defendant's offer of proof, it would appear to me to be a really egregious eavesdropping on the part of an agent of the defense attorney here. . . . And, I think it would be just absolutely violative of any kind of policy that

---

[18] The defendant did not argue, at this time, that Bobryk's testimony would not violate the attorney-client privilege. In a previous discussion regarding Joan Christian's conversation with her attorney at the Enfield courthouse, however, the defendant argued that the attorney-client privilege would not apply if "she knew that there was a third party present."

we can hope to have which keeps attorney-client privileges—attorney-client confidentiality sacrosanct."[19]

Before addressing the merits of the defendant's claim, we briefly set forth the standard of review. "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995). Furthermore, [t]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial. . . . *State* v. *Castro*, 196 Conn. 421, 426, 493 A.2d 223 (1985). The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant. . . . *State* v. *Barnes*, supra, 747. When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, however, such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 350–51, 796 A.2d 1118 (2002). When defense counsel is permitted to expose to the jury the facts from which it appropriately can draw inferences relating to the reliability of the witness, those constitutional rights have been satisfied. *State* v. *Gaynor*, 182 Conn. 501, 509, 438 A.2d 749 (1980).

[19] The trial court also stated: "Now, I'm not suggesting in the slightest, not one iota, that [the defendant's attorney] suggested that . . . Bobryk go and try to overhear the conversation of an opposing party which was being held, they thought, in confidence with her attorney. But that, nevertheless, would be the result that we'd have. We'd essentially have an agent of . . . the attorney for one party surreptitiously positioning herself so that she could [overhear] a conversation between the opposing party and that person's attorney."

With these principles in mind, we turn to the defendant's contentions.

The defendant first claims that the trial court improperly ruled that the proffered testimony was inadmissible extrinsic evidence of a collateral matter. The defendant contends that Bobryk's testimony was relevant and material to the merits of the case, because "[Joan] Christian's bias or motive went to the very core of her testimony . . . ." The state asserts, in response, that the testimony properly was excluded because "the jury had sufficient evidence from which to assess Joan Christian's bias and motivation for testifying against the defendant. Permitting the additional testimony proffered by Bobryk would have unnecessarily complicated the case and unduly distracted the jury's attention from the principal issues before them." We agree with the defendant.

"[C]ross-examination is the principal means by which the credibility of witnesses and the truth of their testimony is tested. *State* v. *Lee*, 229 Conn. 60, 69, 640 A.2d 553 (1994). Although only relevant evidence may be elicited through cross-examination; *State* v. *Kelley*, 229 Conn. 557, 562, 643 A.2d 854 (1994); [e]vidence tending to show motive, bias or interest of an important witness is never collateral or irrelevant. [Indeed, it] may be . . . the very key to an intelligent appraisal of the testimony of the [witness]. . . . *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993) [on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996)]. Accordingly, cross-examination to elicit facts tending to show that a witness' testimony was motivated by bias may not be unduly restricted. Id., 249; see also *State* v. *Francis*, 228 Conn. 118, 123, 635 A.2d 762 (1993). Bias may consist of a friendly feeling or of hostility. It may be shown in a variety of ways. *State* v. *Asherman*, 193 Conn. 695, 719, 478 A.2d 227 (1984), cert. denied, 470

U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 58, 671 A.2d 323 (1996); see also Conn. Code Evid. § 6-5 ("[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely").

In the present case, it is clear that Joan Christian was an important witness for the state. Consequently, evidence of any motive, bias or interest that may have impacted the credibility of her testimony cannot be characterized as collateral or irrelevant. The proffered testimony bore directly on the issue of her motive, bias or interest, in that, had it been heard and credited by the jury, the jury could have inferred that Joan Christian would benefit from the defendant's conviction by virtue of its effect on her civil proceedings against him for divorce and custody of their child. Therefore, the testimony improperly was excluded as collateral.

Furthermore, the trial court improperly determined that admission of Bobryk's testimony would have violated the attorney-client privilege held by Joan Christian. We previously have stated that, "[c]ommunications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice." (Internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, supra, 265 Conn. 10. "By contrast, statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality." *State* v. *Cascone*, 195 Conn. 183, 186, 487 A.2d 186 (1985). The only recognized exceptions to this rule are when the third party was an interpreter, clerk or agent of *the client's* attorney; see *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 158; which Bobryk clearly was not. At oral argument before this court, the state conceded that, because the communication had been made

in the presence of a third party, it was not protected by the attorney-client privilege. Therefore, because the communication at issue was made in her presence, Bobryk should have been allowed to testify.

In light of our conclusion that Bobryk's testimony improperly was excluded, we next must consider whether that impropriety violated the defendant's constitutional rights, or whether the error was merely evidentiary in nature.

We already have concluded that Bobyrk's testimony was relevant impeachment evidence and that the trial court's exclusion of that testimony improperly denied the defendant meaningful access into a legitimate area of inquiry. Whether that impropriety violated the constitutional protection of the confrontation clause depends, however, upon a variety of factors. "[W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Clark*, 260 Conn. 813, 828, 801 A.2d 718 (2002).

We begin by noting that the defendant effectively cross-examined Joan Christian, during which time he was able to extract several admissions concerning her interest in the outcome of the litigation in the present case. For example, the defendant questioned her regarding the pending divorce and child custody proceedings. Joan Christian acknowledged that those proceedings were "hotly contested . . . ." She admitted that, in a discussion with the defendant concerning those proceedings, she had told him that she had been "keeping up" with the status of the present case. She also admitted that she had contacted the state's attorney and had given a statement to the Suffield police department concerning the present case. In addition, the defendant

cross-examined Joan Christian regarding her bias against him. Specifically, she testified that the defendant had abandoned her and their young son, and admitted that she was not "too happy" with the fact that he had left her without paying their bills. Finally, she acknowledged that her conflicts with the defendant had "escalated over time." Accordingly, the defendant exposed numerous facts from which the jury could have concluded that Joan Christian's testimony was tainted by motive, bias or interest, and, therefore, was not credible.

Under all of the circumstances of this case, we conclude that the constitutional standard of confrontation had been met, and, therefore, that the trial court's improper exclusion of Bobryk's testimony was merely an evidentiary impropriety. "[I]n order to prevail on appeal, the defendant must show that the restrictions imposed by the trial court were harmful. . . . In order to do so, the defendant must establish that the impropriety was so prejudicial as to undermine confidence in the fairness of the verdict . . . ." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 260 Conn. 830. We conclude that the defendant has not satisfied this burden.

The defendant, relying on *State* v. *Colton*, supra, 227 Conn. 253–54, contends that the impropriety was harmful because it had a tendency to influence the decision of the jury. In *Colton*, we concluded that the trial court improperly had excluded evidence that a chief witness for the state had abused illegal drugs and engaged in prostitution, because it was relevant to that witness' interest in receiving a monetary award for testifying against the defendant. Id., 251–52. We further concluded that the impropriety constituted reversible error. Specifically, we stated: "The importance of [the witness'] testimony to the state's case against the defendant cannot be underestimated. The state conceded in its closing

argument to the jury that it would have to credit [the witness'] testimony to convict the defendant. . . . The exclusion of evidence bearing on the motivation of a chief witness for the state, particularly when no other evidence corroborated material aspects of the witness' testimony, is harmful error." (Citation omitted.) Id., 254. In the present case, by contrast,[20] as we already have stated, Joan Christian's testimony concerning the material issue of whether the defendant had been driving at the time of the accident was cumulative of the testimony of three other witnesses. See part I of this opinion. Moreover, the state presented a substantial amount of physical evidence, in addition to the testimony of these witnesses, indicating that the defendant had been the driver. See id. Accordingly, we conclude that the evidentiary impropriety of the trial court was harmless.

### III

Finally, the defendant claims that the trial court improperly excluded from evidence the emergency medical "run sheets"[21] prepared by Ruggiero and Ford. Specifically, the defendant claims that the trial court improperly failed to admit the run sheets either as prior inconsistent statements or under the business records exception to the hearsay rule and, therefore, denied him his constitutional right to present evidence that he was confused and disoriented when he made the incriminating statements to Ruggiero and Ford in the ambulance on the way to the hospital.

The following additional facts are relevant to our resolution of this claim. During the state's case-in-chief,

---

[20] We note, moreover, that the impropriety in *Colton* was constitutional in nature, and therefore, in that case *the state*, and not the defendant, had the burden of proving that the error was harmless beyond a reasonable doubt. *State* v. *Colton*, supra, 227 Conn. 254.

[21] The defendant, in his brief to this court, defines a "run sheet" as "the medical record of the injury, condition and treatment of the patient. It is completed by the [emergency medical technician] as part of the record of the ambulance company."

Ruggiero testified on direct examination that she had arrived at the accident scene at approximately 12:55 a.m. on March 18, 2000. At the scene, she made a physical assessment of the defendant, during which she asked him questions concerning the accident. Specifically, Ruggiero asked him if he had been driving and wearing his seat belt, and he answered both questions in the affirmative. The defendant appeared coherent when he answered these questions. During the ambulance ride to the hospital, however, the defendant wavered "between coherent and confused." Ruggiero marked the box labeled "confused" on her run sheet, but she explained that she had done so because "at times, he wasn't really cooperative with answering." Nonetheless, she asked the defendant several times whether he had been driving and wearing a seat belt, and each time the defendant responded in the affirmative.

On cross-examination, the defendant questioned Ruggiero about why she had marked the box labeled "confused" on the run sheet, and not the box labeled "oriented."[22] She explained: "He was oriented to person, place, and time, which is what we go by. He knew where he was, he knew his name, and he knew what time it was. The reason why I checked confused was because he did not remember the accident, the actual impact." Ruggiero further explained that, in her assessment, "he was confused at [the] time." On recross-examination, Ruggiero again acknowledged that the run sheet stated that the defendant had been "confused," and not "oriented," after the accident. Ford testified, on direct examination by the state, that the defendant "was con-

---

[22] The run sheets filled out by Ruggiero and Ford contained a section entitled, "Verbal Response," which included checkboxes for the following five options: (1) "None"; (2) "Incomplete Sounds" or "Incomplete Words"; (3) "Inappropriate Words"; (4) "Confused"; and (5) "Oriented." Ruggiero and Ford both placed a mark in the box labeled "Confused," and left the other boxes blank.

fused at times," but that he was able to answer most of her questions. She asked the defendant, several times, if he had been driving at the time of the accident. Each time, he responded affirmatively. Ford testified that the defendant did not appear to be confused when he told her that he had been driving. On cross-examination, Ford acknowledged that she had marked the box labeled "confused" on the run sheet, and had not marked the box labeled "oriented." She also acknowledged that "there was some confusion," and that the defendant "was not totally oriented . . . ."

After the close of the state's case-in-chief, the defendant offered Ruggiero's and Ford's run sheets into evidence, as either prior inconsistent statements or under the business records exception to the hearsay rule. Specifically, the defendant argued that, because the run sheets "state that the defendant was confused and that he was not oriented" and "the testimony contradicted that," they were admissible under § 6-10 of the Connecticut Code of Evidence[23] as prior inconsistent statements used to impeach the credibility of the witness. The defendant further argued that the run sheets were admissible for *substantive* purposes under *State* v.

[23] Section 6-10 of the Connecticut Code of Evidence provides: "(a) Prior inconsistent statements generally. The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness.

"(b) Examining witness concerning prior inconsistent statement. In examining a witness concerning a prior inconsistent statement, whether written or not, made by the witness, the statement should be shown to or the contents of the statement disclosed to the witness at that time.

"(c) Extrinsic evidence of prior inconsistent statement of witness. If a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court. If a prior inconsistent statement made by a witness is not shown to or if the contents of the statement are not disclosed to the witness at the time the witness testifies, extrinsic evidence of the statement is inadmissible, except in the discretion of the court."

*Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Finally, the defendant argued that the run sheets were admissible as business records, because Ruggiero and Ford had reduced their prior statements into written reports on the date of the accident, as they had been obligated to do.

The trial court determined that the run sheets were inadmissible extrinsic evidence of a prior inconsistent statement. Specifically, the court determined that the statements on the run sheets were not inconsistent with the statements made at trial because Ruggiero and Ford had admitted making those statements on the run sheets. Therefore, the court concluded that the statements were inadmissible for both purposes of impeachment and as substantive evidence. The court did not make a determination concerning whether the run sheets were business records; during oral argument, however, in response to the defendant's assertion that the run sheets were admissible as "business record[s] of . . . prior statement[s]," the trial court stated that "[i]f the witness admits to making the statement, extrinsic evidence of the statement is inadmissible."

### A

The defendant first claims that the trial court improperly precluded the run sheets as prior inconsistent statements for the purpose of impeaching witnesses and as substantive evidence.[24] Specifically, the defendant contends that the prior statements included in the run sheets, stating that the defendant had been confused and not oriented, were inconsistent with the in-court testimony of both Ruggerio and Ford stating that the defendant had been coherent. The state contends, in

---

[24] Although the defendant, in his brief to this court, addressed the usage of prior inconsistent statements for impeachment purposes and substantive evidence as separate issues, we analyze them together.

response, that there was no substantial inconsistency between the in-court testimony and the statements on the run sheets because Ruggerio and Ford both acknowledged having stated, on their run sheets, that the defendant was confused and not oriented. Therefore, the introduction of the run sheets would have been cumulative evidence. See Conn. Code Evid. § 6-10 (c) ("[i]f a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court").

"In deciding whether the statement is admissible, the trial court must review it in light of the witness' entire testimony to determine whether it is, in fact, inconsistent with that testimony; *State* v. *Richardson*, 214 Conn. 752, 764, 574 A.2d 182 (1990); *State* v. *Whelan*, [supra, 200 Conn. 748 n.4]; *State* v. *Piskorski*, 177 Conn. 677, 710, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); and, if so, whether such inconsistency is substantial and relate[s] to a material matter. . . . *State* v. *Richardson*, supra, 763–64. Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 227, 690 A.2d 1370 (1997). As the trial court correctly determined, both witnesses admitted, in their testimony, to their prior statements on the run sheets. Therefore, the run sheets were not inconsistent with the testimony elicited at trial. Accordingly, the trial court did not abuse its discretion in precluding the run sheets as prior inconsistent statements for the purpose of impeaching the witnesses and as substantive evidence.

B

The defendant next claims that the trial court improperly precluded the run sheets under the business record

exception to the hearsay rule. Specifically, the defendant claims that the run sheets are business records because they "are made in the regular course of the business of [ambulance] companies" and emergency medical technicians have "a duty to write the run sheets contemporaneously with the ambulance user." He further contends that the run sheets were admissible, as business records, under General Statutes § 52-180,[25] because they were relevant to the material issue of whether the defendant was coherent when he told Ruggiero and Ford that he had been driving at the time of the accident. The state contends, in response, that the defendant has not established that the run sheets were business records in accordance with the requirements of § 52-180 (a). The state also contends that any error in the trial court's evidentiary ruling was harmless because the proffered evidence would have been cumulative.

"Section 52-180 sets forth an exception to the evidentiary rule otherwise barring admission of hearsay evidence for business records that satisfy express criteria. *Calcano* v. *Calcano*, 257 Conn. 230, 240, 777 A.2d 633 (2001); *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 600, 717 A.2d 713 (1998); see also Conn. Code Evid. § 8-4 (incorporating § 52-180). Section 52-180 (a) provides that a record of an act, transaction, occurrence or event is admissible as evidence of that act, transaction, occurrence, or event, provided that the record was made in the regular course of business. *Pagano* v. *Ippoliti*, 245 Conn. 640, 650–51, 716 A.2d 848 (1998). The rationale for the exception derives from the inherent trustworthiness of records on which busi-

---

[25] General Statutes § 52-180 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

nesses rely to conduct their daily affairs. *Calcano* v. *Calcano*, supra, 240–41 (§ 52-180 recognizes the inherent trustworthiness of documents created for business rather than litigation purposes); *Bell Food Services, Inc.* v. *Sherbacow*, 217 Conn. 476, 486, 586 A.2d 1157 (1991) (fact that the business relies on such records tends to establish their trustworthiness); see generally *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 600–601 (setting forth development of rule)." (Internal quotation marks omitted.) *State* v. *Kirsch*, 263 Conn. 390, 400, 820 A.2d 236 (2003).

"To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in . . . § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . In applying the business records exception, the statute [§ 52-180] should be liberally interpreted." (Internal quotation marks omitted.) *Calcano* v. *Calcano*, supra, 257 Conn. 240–41.

We need not decide whether the trial court's failure to admit the run sheets into evidence under § 52-180 was improper because, even if it was, the impropriety was harmless. As we previously have stated, Ruggiero and Ford both testified that their run sheets referenced the fact that the defendant was confused, rather than oriented. See part III A of this opinion. The run sheets would have been merely cumulative of this testimony and, therefore, any impropriety in disallowing the run sheets under § 52-180 was harmless. See *State* v. *DeJesus*, 260 Conn. 466, 486, 797 A.2d 1101 (2002) (exclusion of cumulative evidence harmless).

The judgment is affirmed.

In this opinion the other justices concurred.